## BLAIR, Respondent, v. BLAIR, Appellant.

**St. Louis Court of Appeals, May 12, 1908.**

1. **DIVORCE: Indignities: Weight of Evidence.** In an action for divorce brought by the wife against the husband, where the parties had a large family of grown-up children, the evidence is examined at great length and it is held the weight of the evidence shows the defendant subjected the plaintiff to intolerable indignities by neglect, abusive language and constant quarrelsome conduct.

2. ———: **Alimony: Circumstances to Consider in Determining Amount of Alimony: Property Belonging to' Wife.** In determining whether the allowance by the trial court of alimony in favor. of the wife, who is adjudged entitled to a divorce, is reasonable, the property and earning capacity of the husband must be primarily considered, but the determination must also be had with reference to the means owned by the wife in her own right and particularly that portion of her means which was given to her by her husband.

3. ———: ———: ———: ———. Where a wife was awarded a decree of divorce against her husband, both of them being above the age of fifty years, and it was shown that she possessed property given her by her husband of the value of $7,000 and that he had property of the value of less than $6,000 from which he received an income of about $400 per annum, an allowance of $2,200 alimony in gross to the wife was excessive and is reduced to $1,000; an allowance of $15 a month for the support of two minor children was allowed to stand, it being shown that the children had means given by other relatives.

Appeal from Pike Circuit Court.—*Hon. David H. Eby,* Judge.

·MODIFIED AND AFFIRMED.

*Tapley & Fitzgerrell* for appellant.

(1) The statute (R. S. 1899, sec 2626) provides that "the court shall make such order touching the alimony and maintenance of the wife, and care and custody and maintenance of the children or any of

them, as from the circumstances of the parties and the nature of the case shall be reasonable." This statute contemplates that the property, owned by the wife as well as by the husband, shall be considered in fixing the amount of the alimony. Golding v. Golding, 74 Mo. 123. (2) "The allowance of permanent alimony is a matter of sound judicial discretion, to be exercised with reference to established principles and upon a view of all the circumstances of each particular case, such as the estate and ability of the husband, the condition and means of the wife, and the conduct of the parties." 2 Am. and Eng. Ency. Law (2 Ed.), p. 120.

*J. D. Hostetter* for respondent.

Where the wife secures a decree for divorce, she is entitled to a judgment for alimony regardless of the value of her individual property. R. S. 1899, sec. 2927. The primary duty of the father to support the minor children remains, no matter who secures the divorce. Chester v. Chester, 17 Mo. App. 657.

GOODE, J.—This is a divorce suit. The parties were married September 11, 1873, in Kentucky, moved to Bowling Green, Missouri, in 1877, and have resided there ever since. At the time of the trial in 1906, plaintiff was fifty-three years old and defendant fifty-six. They have seven children whose names and ages at said time were as follows: Garnett, 31 years old, Maude 28, Martha 26, Frank 24, Annie 20, Joseph 18 and Mary 14. The first separation, plaintiff says, was in September, 1901, and continued until Christmas, 1903, when, because of her sympathy for defendant, who was ill, she resumed conjugal relations with him. During that interval the parties lived in the same house, but plaintiff occupied a room with her daughter Maude, and defendant says he did not understand they were separated but that his wife was taking care of Maude who was sick. A separation occurred January, 1904,

a short time after what plaintiff calls a reconciliation and since then they have lived apart, though in the same house. On October 27, 1905, plaintiff, in whose name the title to the property stands, had the sheriff serve a written notice on defendant, forbidding him to use or occupy any part of the house as a residence or to sleep or take his meals there. The house had been built by defendant, who swore he put $3,500 to $4,000 into it, and he refused to vacate. The testimony covers ten years of the married life of the parties and is so extensive that no epitome of it is likely to convey an accurate impression of the real characters of the members of the household, including the children, who play a large part in the case, the feelings and behavior of all concerned at different times, the comparative blame of each person for the frequent altercations which occurred, and the final estrangement of plaintiff and the children from defendant. The obstacle to a correct understanding of cases like this is that the disputes and quarrels of years are condensed into a narrative which may be read in a few hours, thereby throwing the tenor of the family life as a whole into a false perspective. These parties had no trouble for twenty-four years but lived contentedly together until about 1897. Plaintiff testified that prior to said date her husband had given her no cause of complaint, and had provided well for the family; as, indeed, in our judgment he continued to do; for he furnished a good house, reared his children in comfort and educated them well. He is a lawyer and has practiced his profession for many years in Bowling Green. He also holds two-thirds of the stock of a corporation which owns a set of books containing abstracts of the titles to lands in Pike county, and conducts an abstract business. About the year 1905, a young woman, whose name we forbear to mention, acquired part of the remainder of the capital stock of the abstract company and afterwards assisted in man-

aging the business, thereby being placed in the same office rooms with defendant.     His son Garnett, who had been graduated from the law school of the State University in 1895, was taken into partnership with his father in the practice of the law, defendant furnishing a library and defraying the office and other expenses of the business.     They continued in partnership for nine years, or until 1904, and during said period Garnett occupied the same rooms his father and the young lady occupied. .  In 1897 plaintiff conceived the notion defendant was too attentive to the young woman and that his interest in her had excited comment in the community and caused him to grow cold and indifferent toward plaintiff. The children shared this opinion, which we are convinced was the main cause of the estrangement that grew up between plaintiff and defendant. Defendant's health, which never had been good, became greatly impaired in 1905, affecting his nerves, making him morose and irritable and leading him to use intoxicants; a habit which grew on him and became excessive.     These things contributed toward causing the relations between him and his family to become strained and contentious.     Whisky was prescribed for him by his physician, but the evidence inclines to prove he drank more than was necessary and was often intoxicated on Saturday nights and Sundays; though it is due to him to say at this point, he attended steadily to business, not missing a day from his office, and many of his townsmen said they never had seen him under the influence of liquor.     His irritability from illness and excessive drinking, and the resentment of his wife and children at his supposed interest in the young woman, led to frequent quarrels, sometimes of a violent character, between him on one side and his wife and the five adult children on the other, culminating finally in complete aversion on the part of his wife.     As to this matter the trial court found that after the young lady

in question entered the abstract business, defendant grew cool toward plaintiff, neglectful of her and the children, cross and disagreeable, and that this disposition increased; that he made remarks to plaintiff and the children which were disparaging to them in comparison with the young woman, took the side of the latter in a dispute which arose between her and defendant's daughter Maude, grew angry because his wife and daughters would not visit the young lady, took most of his noon meals with her at the office, frequently drove her home in his carriage, and that since 1895 his conduct toward her had been in marked contrast to the neglect and apparent absence of affection which marked his treatment of plaintiff. The court further found that after the young lady learned her association with defendant had excited some comment, she refused to permit any attentions from him except such as were proper between business associates; and that the evidence showed she was a woman of pure character and reputation. It ought to be said in this connection that many disinterested witnesses from the best circles in the community, united in testifying to her spotless name and high character. Defendant did not treat his wife's feelings and reproaches about his association with the young woman in the right spirit, but with unsympathetic harshness. During the seven years this source of irritation existed it was the underlying cause of many of defendant's quarrels, both with plaintiff and the children, and his conduct in these altercations constitute the indignities alleged in the petition. Most of them were sustained by the findings of the lower court and held to have rendered plaintiff's condition intolerable. Besides the findings we have recited about his behavior with the young lady, the court found defendant had been guilty of the following indignities to plaintiff: had applied vile and opprobrious epithets to her, such as skunk, nasty hussy, bitch, son of a bitch, sallow-faced

thing; had menaced her with a poker and said he would
strike her if he wanted to; on her saying she would tell
her brother of defendant's mistreatment, he threatened
to kill her brother if the latter interfered; that he threat-
ened the lives of his sons Frank and Garnett, assaulted
the latter with a knife and on another occasion pointed
a gun at him, took an axe to his room and declared he
would kill Frank with it, applied opprobrious names
to both the boys and the girls on several occasions, call-
ing them sons of bitches and scoundrels, upheld his son
Joe in rebellion against his mother's authority and in
calling her low names, threatened to chastise his daugh-
ter Annie for interfering with Joe on her mother's be-
half, glared at plaintiff and her children at the table
in a snarling and brow-beating manner; was drunk
practically every Saturday night and Sunday; would
spend his nights of intoxication in cursing and incoher-
ent talk, which kept the members of the family awake;
ordered his daughter Maude away from home when she
was very sick, saying he would serve notice on her to
leave, tried to strike Maude with his fist on one occas-
ion and shoved plaintiff out of the room for remonstrat-
ing against his treatment of Maude.     Several other
incidents of a similar kind are recorded in the findings.
The court acquitted plaintiff of the charges preferred
against her in the answer, to-wit, calling defendant vile
names, and encouraging the older children to defy their
father's   authority   and   sanctioning   attempted   as-
saults on him by the boys.     As regards the illness of
defendant, the court found his health was seriously im-
paired by nervous prostration and other maladies, es-
pecially since the years 1903 and 1905, that he became
afflicted with insomnia and his nervous system was so
shattered the least noise or confusion added to his suf-
ferings; but found also his wife did nothing for the pur-
pose of annoying him; and that his intoxication was vol-
untary and not the necessary result of the reasonable use

Blair v. Blair.

of liquors as medicine. Plaintiff was found to be the injured party and entitled to a divorce and the custody of the two minor children. The decree as first rendered allowed her $2,500 alimony in gross and $20 a month for the support of the minor children, but afterwards was amended so as to allow $2,200 alimony in gross and $15 a month for the minor children's support. Defendant did not pray in his answer for a dissolution of the marriage tie, and on this appeal he asks a reversal of the order for divorce as unwarranted by the evidence, and complains of the alimony allowed as excessive.

We have concluded to accept the findings of the court below as supported by the weight of evidence. The indignities established against defendant by the decree well might render plaintiff's condition intolerable and entitled her to a separation. Nevertheless we deem it fair to defendant to say there is much in the record which tends to explain and palliate most of the graver offenses he was found to have committed. He denied having intentionally insulted his wife by the use of epithets and, in effect, said if he did so it was when he was not conscious of what he said in consequence of his sufferings and from drugs he had taken. Physicians testified he might have been in a semi-delirious state and hardly aware of his conduct. His acquaintances of years' standing, and who are admitted to be among the best citizens of the community, join in giving him the character of a sober, upright and industrious man, and vindicate him from any improper relationship with the young lady who is interested with him in business. Most of the members of the family appear to be sickly and all of them nervous, high-strung and irritable, easily angered and prone, when angry, to violent speech and sometimes acts. The behavior of the children toward both parents, but chiefly the defendant, was often rep-

rehensible, and wanting not only in affection, but in reasonable deference to parental authority in the household.    It is not our impression that defendant ever cherished any design against the lives of his sons, or wished to injure them, or that he seriously misused any of his children.    So far as his conduct toward them is concerned, we cannot say, on the entire evidence it was worse than was theirs toward him.    We think he was not deficient in affection and concern for their welfare. He provided liberally for them as they grew up and endeavored to give them a start in life; as instance, the opportunity he afforded Garnett when the latter was ready to practice law.    One daughter was dangerously ill for eleven months with nervous disorders, and during the entire period he took care of her half of every night, often bathing her as many as from fifteen to thirty times during the night, his wife swore.    Such incidents demonstrate his parental regard; and on the other hand we find in the testimony incidents of most unfilial conduct by the older children which, out of deference to their feelings, we refrain from relating. Neither father nor children can be acquitted of blame for the bitterness which was engendered, and justice to the former requires that the provocations he endured be indicated.    We rest our affirmance of the decree for separation not so much on mistreatment of the children by defendant which lacerated the feelings of the mother, though the names he called them cannot be excused, as on our belief that the weight of the evidence shows defendant subjected plaintiff to intolerable personal indignities by neglect, abusive language and constant morose and quarrelsome conduct.

We take up the question of alimony.    Whether or not the court's allowance is reasonable is to be determined on consideration primarily of the property and earning capacity of the defendant, but with reference, too, to the means owned by his wife in her own right,

and particularly that portion of her means which had been given to her by him.   [Golding v. Golding, 74 Mo. 123; 2 Am. and Eng. Ency. Law (2 Ed.), pp. 120 to 123 and citations in notes.]    Defendant had invested say $3,500 of his means in the home place, the title to which was in his wife.    He had also invested the same sum in a farm in the county, which was in her name; that is to say, had furnished $7,000, if not more, to acquire the properties to which she holds title.    Besides this she has some household furniture, cows, and a little money. We estimate his own possessions as follows:

| | |
|---|---:|
| A half interest in 3 buildings | $  900 |
| Two-thirds interest in abstract books | 3,000 |
| Law Library | 300 |
| Four horses | 300 |
| One note | 260 |
| Cash | 800 |
| Other personal property | 200 |

Total ...................................$5,760.

Such is our maximum valuation of his holdings after careful attention to the testimony bearing on the question.    The defendant is fifty-eight years old, utterly broken in health, unable to practice his profession and the income from the abstract business is very small. In fact the testimony is that for three or four years past the income has not been enough to pay the expenses of keeping them up—has been not quite four hundred dollars per annum. Defendant is manifestly near the end of his earning capacity and to pay a judgment of $2,200 and then $15 a month for the support of the minor children, will probably be beyond his power.    To compel him to raise such a sum will reduce him in our opinion, to absolute penury.    Considering the property belonging to plaintiff which he paid for, it looks too harsh to force a payment out of his present means of $2,200.    The allowance of $15 a month for the two

minor children is reasonable. It is to be remarked that these children, as well as the older ones, were left some means by a relative. The decree will be modified so as to allow plaintiff $1000 in gross and with this modification will be affirmed. All concur.